788 P.2d 1189

**FOUNDATION DEVELOPMENT CORPORATION, an Arizona corporation, Plaintiff-Appellant, Cross-Appellee,**

v.

**LOEHMANN'S, INC., a New York corporation, Defendant-Appellee, Cross-Appellant.**

No. CV-89-0010-PR.

Supreme Court of Arizona, En Banc.

March 15, 1990.

Murphy & Posner by Michael L. Murphy and K. Bellamy Brown, Phoenix, for Foundation Development Corp.

Mariscal, Weeks, McIntyre & Friedlander, P.A. by James G. Speer and Perry, Pierson & Kolsrud by Renee B. Gerstman, Phoenix, for Loehmann's, Inc.

FELDMAN, Vice Chief Justice.

Loehmann's, Inc. (Loehmann's) petitions us to review a court of appeals opinion dealing with grounds for termination of a long-term commercial lease. *See Foundation Dev. Corp. v. Loehmann's Inc.*, 162 Ariz. 26, 780 P.2d 1074 (Ct.App.1988). The trial court ruled that Loehmann's delay in paying a common area charge was a trivial breach of its lease and therefore refused to permit the landlord, Foundation Development Corporation (Foundation), to re-enter and take possession of the leased premises. The court of appeals reversed. We granted review to clarify the law dealing with triviality of breach as a defense to a forfeiture of a tenant's interest in a commercial lease. *See* Rule 23, Ariz.R.Civ.App.P., 17B A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. § 12–120.24.

## FACTS AND PROCEDURAL HISTORY

The parties filed cross motions for summary judgment on stipulated facts set forth in a Joint Statement of Facts (Facts) filed May 14, 1987.

In 1978, Loehmann's became the anchor tenant in the Lincoln View Plaza Shopping Center by entering into a twenty-year lease with Foundation's predecessor in interest.[1] The lease contained no provision for percentage rental or rental increase during the twenty-year term. Loehmann's had an option to renew for two five-year terms. The lease therefore was potentially of thirty years' duration, expiring in 2008. Loehmann's was to operate a retail clothing store, part of its nationwide chain.

In addition to rental payments due on the first day of each month, Loehmann's was liable for common area charges[2] based on its proportionate share of the total square footage in the shopping complex. Loehmann's customary practice was to make estimated partial payments for the common area charges at the end of each of the first three quarters of each lease year. At the end of the fourth quarter, Foundation submitted an adjusted statement itemizing its actual expenditures for the year. Loehmann's then paid the difference between the partial payments it had made and the total actual expenditures, generally paying thirty days or longer after it received the statement. Loehmann's total annual payments to Foundation were approximately $50,000 ($45,000 annual rent plus approximately $5,000 for common area charges).

The lease also contained a section describing "Conditions of Default." If Loehmann's failed "to pay any installment of minimum annual rental or additional rental or other charges [and did not cure] within ten (10) days after receipt ... of notice of such neglect or failure," Foundation could "prior to the removal of such Condition of Default," elect to terminate the lease. The lease stipulated that "with respect to ... [Loehmann's] obligation to pay rent, taxes and other charges ... [or] in any case

---

1. Foundation acquired the property in 1986.

2. Such charges include a prorata share of the cost of lighting and maintaining sidewalks, parking lot, and similar items.

where either party ... is required to do any act, the time for the performance thereof shall be of the essence." [3]

On February 23, 1987, Geri Beemiller (Beemiller), an employee of Foundation's local managing agent, Rae–Marc Asset Management (Rae–Marc), sent Loehmann's the year-end statement for common area charges for the lease year ending January 31, 1987. Facts, Exhibit F (hereafter Exhibit __). The statement was addressed to Kevin Gaw (Gaw) at Loehmann's Halsey Street address in New York. The balance due was $3,566.44. The statement did not indicate when payment was due, and Beemiller indicated that if Gaw had any questions, he should contact her. The lease had no provision indicating a time schedule for the payment of the fourth installment of the common area charge.

Believing that Foundation had miscalculated its proration of the total square footage of the complex, Gaw sent an inquiry to Beemiller on March 18, 1987. Exhibit G. Beemiller responded to the Halsey Street address on March 25, 1987, indicating that because a portion of the complex had been sold, Loehmann's proportionate share of the total had been increased. Exhibit H.

On April 10, 1987, Timothy Richardson, another Rae–Marc employee in Phoenix, sent a demand letter to Loehmann's. Exhibit I. He referred to the original February 23, 1987 statement (erroneously noting that it covered the period ending March 31, 1987 and not January 31), and appended it, but did not mention Gaw's recent inquiry to

Beemiller or the latter's response. He addressed the letter to Loehmann's at the leased premises in Phoenix and at the address listed on the lease on Baychester Avenue, New York.[4] He copied the letter to the Halsey Street address. Richardson did not address the letter to a specific individual. He further stated:

> We have not yet received your payment in the amount of $3,566.44. We must reinstate time of the essence of your lease and insist that this amount be paid within ten days from the date of this letter.

Exhibit I.

Loehmann's received Richardson's letter in the Phoenix store on April 13, 1987. Because the local store was not responsible for paying rent or other charges, the letter was forwarded to the Halsey Street office. The letter sent to the Baychester Avenue address was returned to Foundation, presumably because Loehmann's no longer occupied that building.

Loehmann's Halsey Street office received the letter on Friday, April 17, 1987. Apparently because the letter was not addressed to any particular individual, the mail room personnel sent it to Loehmann's general counsel, Marvin Gardner. Mr. Gardner was not in his office that Friday, which Loehmann's notes was Good Friday. When he returned to work on Monday April 20, 1987, he sent the notice to the accounting department. A senior staff accountant marked the letter "REC'D 4–20–87." Exhibit I. The accountant approved the original statement for common area

---

3. Under the terms of the lease, Loehmann's was obligated to pay the annual rent "in advance in equal monthly installments ... on the first day of each calendar month." Loehmann's practice was to mail its rent payments from its New York office on the first day of each month or a few days prior. Foundation received the payments in Phoenix between the first and sixth of the month. Facts, ¶ 6.

4. Loehmann's had moved its administrative office from Baychester Avenue to Halsey Street in 1982. The lease provided that all notices be sent by certified or registered mail to the leased premises or to the Baychester address. Exhibit A. Loehmann's offered in evidence a 1982 amendment of the lease that indicated all written notice should be sent to the new location on

Halsey Street: "Attn: President." Exhibit C. Beemiller, Richardson, and William Crotts, Foundation's president, all filed affidavits denying knowledge of the July 16, 1982 amendment. In addition, Foundation offered a tenant estoppel certificate into evidence that indicated the lease had been amended on only two occasions: July 10, 1979 and March 13, 1979. Exhibit E. Therefore, according to the evidence admitted, Foundation had no obligation under the lease to send notice to the Halsey Street address. Foundation, however, had sent its original bill to the Halsey Street address. In practice, therefore, Foundation, appeared to be aware that Loehmann's conducted its business at the Halsey Street address.

charges on April 22, 1987 by affixing his initials, and noting the date and the store number. Exhibit F. On Friday April 24, 1987 a check was issued. Exhibit J. Loehmann's claims the check was mailed the next day, April 25. Exhibit K. On Tuesday April 28, 1987, Foundation filed a complaint in superior court seeking termination of the lease, immediate possession of the leased premises, and payment of the accrued common area charges. A day later, April 29, Foundation received Loehmann's check in Phoenix.

In the trial court, Foundation argued that it was entitled to summary judgment because Loehmann's breached its obligation to pay the common area charge in a timely fashion. In its cross motion for summary judgment, Loehmann's argued that the payment was timely, but, if not, forfeiture was improper, as a matter of law, because its failure to pay was a "mistake." Alternatively, it argued that any breach was trivial and did not constitute grounds for forfeiture.

The trial court found two issues were presented: (1) Whether Loehmann's breached the lease by failing to make payment within ten days; and (2) if so, whether the breach was trivial and therefore not sufficient to justify forfeiture of Loehmann's leasehold. The court found that Loehmann's had breached its lease with Foundation, but that the breach was trivial. Thus, it found Loehmann's was not in unlawful possession pursuant to the forcible entry and detainer statute and refused to allow Foundation to terminate the lease. Foundation appealed.

The court of appeals acknowledged that under usual principles of contract law a trivial breach does not justify forfeiture. However, citing *DVM v. Bricker*, 137 Ariz. 589, 672 P.2d 933 (1983), the court stated that this "principle ... is not embraced by Arizona courts in the landlord-tenant context." 162 Ariz. at 29, 780 P.2d at 1077. Believing that under *Bricker* forfeiture may be effected even though the breach

was not material, the court found that because Loehmann's "violated a provision of the lease," the trial court erred in denying forfeiture. *Id.* at 28, 780 P.2d at 1076. Again recognizing substantial authority to the contrary, the court also held that even if Loehmann's delay in paying the common area charge would otherwise have been a trivial breach, under Arizona law the "time of the essence" provision made it a material one. At 29, 780 P.2d at 1077. The court reversed the trial court's judgment. We granted Loehmann's petition for review because of the substantial legal question presented.

The interplay of property and contract law in the landlord-tenant relationship is complex. Thus, before deciding whether the breach in this case could support a forfeiture, we must examine the common law nature of that relationship. Only then is it possible to determine the legislative objective behind the century-old statute that is now A.R.S. § 33–361.

## DISCUSSION

### A. The Historical Perspective

The landlord-tenant relationship had its genesis in feudal England. Most land was held through a personal relationship between a tenant and his lord,[5] the tenant expecting to hold for a lifetime, the lord expecting to dispose of the holding as he pleased after the tenant died. Restatement (Second) of Property, Introduction, at 1 (1977). As the concept of a tenancy for years first developed, the law regarded the tenant as having only contract rights. *Id.* at 3. Courts, however, gradually became aware that mere contractual remedies did not protect the tenant's right to quiet enjoyment of the property. *Id.* By 1235, the development of the writ *quare ejecit infra terminum* gave the tenant a remedy against those who took from the original landowner, and by the fifteenth century, the writ *de ejectione firmae* afforded him protection against third parties, not only those claiming through his landlord. *Id.* The law

---

**5.** The medieval words "lord" and "tenant" are still used, and the customary covenant to pay rent makes the modern relationship tenurial in

nature. R. CUNNINGHAM, W. STOEBUCK & D. WHITMAN, THE LAW OF PROPERTY § 6.12, at 268 (1984).

clearly recognized that the tenant had an important property right in the leasehold that transcended his contractual relationship with the landlord. F. POLLOCK, THE LAND LAWS 143 (3rd ed. 1896) ("The lessee's interest is now beyond question property, not the mere right to the performance of a contract.").

Thus, because of its historical underpinnings, landlord-tenant law is infused with principles of both real property and contract law. R. CUNNINGHAM, W. STOEBUCK & D. WHITMAN, THE LAW OF PROPERTY § 6.10, at 265 (1984). Therefore, although logically and analytically it is correct to say that a lease is both a conveyance and a contract, the modern law traditionally viewed it as a conveyance. *Id.*

An important consequence of recognizing a lease as a conveyance was that when contract law developed the concept of dependency of covenants and thus permitted the equitable remedy of rescission upon breach, landlords and tenants did not share in this remedy. *Id.* Consequently, in the absence of a statute or lease clause authorizing it, neither landlord nor tenant was empowered to terminate a leasehold because of the other's breach, and violation of a lease covenant gave rise only to an action for the damages caused by the breach. *Id.* § 6.76, at 393; *see also Thompson v. Harris*, 9 Ariz.App. 341, 345, 452 P.2d 122, 126 (1969) (recognizing the general rule that covenants in a lease are independent unless expressly made dependent, and that breach by one party gives rise only to a suit for damages). Thus, at common law a landlord could not dispossess a tenant who failed to keep his promise to pay rent, and had to be satisfied with damages for the breach.

Moreover, even if the lease specifically gave the landlord the equitable remedy of rescission—the right to re-enter and terminate for non-payment of rent—the Court of Chancery would prevent forfeiture upon payment of the rent in arrears and costs.

*See* POLLOCK, at 149. The court provided relief based "upon the notion that such condition and forfeiture [were] intended merely as security for payment of money." 1 J. POMEROY, EQUITY JURISPRUDENCE § 453, at 290 (1941). Such lease provisions were not intended to enable the landlord to obtain undue advantage of a tenant on technical and inequitable grounds. *Id.* at 291. Nor were they designed to destroy the landlord-tenant relationship for "slight reason." *See* Annotation, *Relief Against Forfeiture of Lease For Non-payment of Rent*, 31 A.L.R.2d 321 (1953). Of course, general equitable principles applied in such situations. For the court to grant relief, the tenant must have dealt fairly and must have made an honest attempt to comply with the provisions of the lease. 1 J. POMEROY § 453, at 293.

Obviously, the common law traditionally sought to stabilize and maintain the landlord-tenant relationship in cases where breach had occurred. Should a different rule obtain when a landlord seeks forfeiture pursuant to statute?

B. Arizona: Statute, Lease Provision, and Case Law

In Arizona, A.R.S. § 33–361(A) confers the right of re-entry and termination to the landlord for the violation of a commercial lease. The precursor to this statute became law in 1895.[6] Presumably, the legislature responded to burgeoning business interests in the territory by affording the landlord a right of rescission. The statute states in pertinent part that:

> ... [w]hen a tenant neglects or refuses to pay rent when due and in arrears for five days, or when tenant violates *any* provision of the lease, the landlord ... may re-enter and take possession, or without formal demand or re-entry, commence an action for recovery of possession of the premises.

---

**6.** The language of the statute has changed little since 1895. *See* No. 56, § 2 [1895] Ariz.Laws

76; § 2693, A.R.S. 1901; § 1552, A.R.S. 1913;

A.R.S. § 33–361(A) (emphasis added).[7]

We join Foundation in reading the statute as expressing a legislative intent to confer on the landlord a right to terminate for breach, a right not possessed at common law in 1895 absent a contractual provision. We do not, however, necessarily read it so broadly as Foundation urges—to express a legislative intent that any breach, at any time, of "any provision" would give the landlord the right to forfeit the leasehold.

Foundation argues, however, that so long as the lease provides that violation of a covenant is grounds for termination, the court must enforce the lease according to its terms. It also contends that because the lease provides for forfeiture and A.R.S. § 33–361(A) permits the landlord to "re-enter and take possession" for "violation of any provision of the lease," the trial court has no discretion regarding the enforcement of the forfeiture.

In claiming A.R.S. § 33–361 prevents judicial consideration of equitable defenses to forfeiture of Loehmann's leasehold interest, Foundation ignores the important interplay of property and contract law that preceded the enactment of the statute. The property rights concept—that a lease was a conveyance—was essential to maintain economic equilibrium in an agrarian environment. The fact that leasehold interests now prevail in the urban, business world does not diminish their importance. Commercial tenants often make substantial investments for fixtures or for improvements to the leasehold. They hire personnel and enter into agreements (often long term) to foster the continuation of their enterprise based on the expectation that they will be able to conduct their business for the term they have leased the property. Sound public policy reasons militate in favor of assuring the stability of such economic relationships. Accordingly, absent some express statement of legislative intent, we are hesitant to believe that, in enacting A.R.S. § 33–361, the legislature intended to permit forfeitures under any and all circumstances, no matter how trivial, inadvertent, non-prejudicial, or technical the breach.

Arizona case law supports our conclusion. In *Thomas v. Given*, 75 Ariz. 68, 251 P.2d 887 (1952), we cited Pomeroy's EQUITY JURISPRUDENCE for the proposition that a court cannot provide equitable relief against a statutory forfeiture[8] "however much it may interfere with the operation of common law rules." 75 Ariz. at 70, 251 P.2d at 889. However, we did not recognize any absolute rule. Rather, we found a court may relieve a statutory leasehold forfeiture on "the grounds of fraud, accident or mistake." *Id.* Finding the trial court was correct in concluding that the nonpayment of rent was inadvertent and through mistake, we refused to permit a forfeiture of the lease.

There is no basis suggested for applying a different rule for a trivial or immaterial breach. By enacting A.R.S. § 33–361, the legislature effected a change in the operation of the common law: the landlord could seek to terminate a lease for a tenant's breach even in the absence of a lease provision conferring that right. Generally, we strictly construe statutes that are in derogation of the common law. *Richardson v. Ainsa*, 11 Ariz. 359, 95 P. 103 (1908), *aff'd*, 218 U.S. 289, 31 S.Ct. 23, 54 L.Ed. 1044. While we will uphold a forfeiture when the breach is significant, we do not believe we should so literally construe A.R.S. § 33–361 as to enable a landlord to obtain an undue advantage over his tenant by permitting forfeiture for every or any breach, no matter how trivial or technical. Given the history briefly outlined above, we believe the legislative interest in enacting the predecessor of § 33–361(A) was merely to give the lessor a right not recognized at common law—the

---

§ 4325, A.R.C. 1928, am. § 3, Ch. 30, L.1937; § 27–1215, C. 1939.

7. Once the action is commenced, it is governed by the forcible entry and detainer statute, A.R.S. § 12–1171 to 12–1183.

8. The landlord in *Given* relied on § 27–1215, A.C.A.1939, an earlier version of A.R.S. § 33–361. *See Given*, 75 Ariz. at 69, 251 P.2d at 888.

right to terminate in the absence of a contractual provision. We do not believe the legislature intended to enact the dangerous doctrine that forfeiture was to be permitted for any breach no matter how inconsequential.

Foundation, however, claims "no Arizona cases hold that a court should not enforce the bargained-for terms of the lease if a breach is 'trivial.'" Response to Petition for Review at 7. It further contends *DVM Co. v. Bricker* is directly on point and holds that A.R.S. § 33–361 contains no requirement that the breach of a lease be material. Loehmann's, on the other hand, claims *Bricker* "expressly recognized that a trivial breach should not work a forfeiture of a commercial lease." Petition for Review at 9. Thus, it argues, the court of appeals improperly applied the case in reversing the trial court's decision.

*Bricker* does not provide clear guidance as to whether a court should enforce a forfeiture even if the breach was trivial. In holding the landlord had the right to terminate the lease, we explicitly found the breach material. We then stated that whether the breach was sufficiently material to warrant termination was not an issue under A.R.S. § 33–361(A).[9] However, we then cited *Bolon v. Pennington*, 6 Ariz. App. 308, 432 P.2d 274 (1967), for the proposition that "we might ignore a trivial breach." *Bricker*, 137 Ariz. at 592, 672 P.2d at 936. We do not believe *Bricker* can be read as holding that the statute requires the court to enforce a forfeiture based on a trivial breach.

While acknowledging that equity abhors a forfeiture, relying on *Karam & Sons Mercantile Co. v. Serrano*, 51 Ariz. 397, 77 P.2d 447 (1938), Foundation also claims an Arizona landlord is entitled to enforce his contract according to its express terms. In *Karam* we stated, without reference to any statutory directives, that when a tenant "violates any of the convenants of the lease, and it is provided that such a violation shall cause a forfeiture of his lease, the courts will enforce such forfeiture." 51 Ariz. at 407, 77 P.2d at 451. However, we nevertheless affirmed the trial court's judgment that the tenant had *not* breached any provision in the lease and thus did not permit the landlord to recover possession of the premises. We did not discuss the magnitude of breach or imply that we had abdicated our equitable powers to prevent an unjust forfeiture. Foundation's reliance on *Karam* is also misplaced.

Arizona cases simply do not support the conclusion that we have taken the position that forfeitures will be enforced under the statute or the lease provisions regardless of equitable defenses. *See* P. Baird, *A Study of Arizona Lease Terminations*, 9 ARIZ.L.REV. 187, 191–92 (1967) (discussing "limitations on the effectiveness of § 33–361(A) to terminate a lease").

### C. Other Authority

Other courts have refused to enforce a forfeiture when both lease and statute permitted one under the circumstances of the case. 2 POWELL ON REAL PROPERTY ¶ 246[1], at 17–15 (court may conclude vio-

---

**9.** We also alluded to the differences between the language of A.R.S. § 33–361(A), addressing commercial agreements and A.R.S. § 33–1368(A), the residential statute. The two statutory schemes were enacted at different times to protect different interests. The Arizona Residential Landlord and Tenant Act was enacted in 1973. The Act was the product of efforts in the 1970s by legal scholars to bring about broad legislative reform of landlord-tenant law in cases involving residential property. Note, *Landlord–Tenant Reform: Arizona's Version of the Uniform Act*, 16 ARIZ.L.REV. 79 (1974). It was based on the Uniform Model Residential Landlord–Tenant Code, a remedial act whose purpose was to accord residential tenants rights previously unrecognized at common law. *See* Comment, *The*

*Uniform Residential Landlord and Tenant Act: New Hope for the Beleaguered Tenant?*, 48 ST. JOHN'S L.REV. 546 (1974) (act's most "potent provisions" create nonwaivable tenant rights and thus compensate lessee for his lack of bargaining power and protect him from victimization by adhesion contracts). Thus, we may assume the Arizona legislature's goal in enacting the Residential Landlord–Tenant Act was to protect tenants rights in the residential setting. On the other hand, A.R.S. § 33–361(A), first enacted in 1895, afforded the landlord the right to redress for a tenant's breach he did not have under the common law. We do not believe comparisons of intent between two acts passed almost eighty years apart are particularly helpful.

lation is not "substantial or material" under lease or "applicable statute," thus leaving landlord the right to damages rather than lease termination); *see also Farmer v. Pitts*, 108 Neb. 9, 187 N.W. 95 (1922) (even though statute permitted termination without notice upon tenant's failure to pay rent, court found tenant had right to equitable defenses and denied termination when payment mailed was three days late and landlord failed to make demand for payment); *Strom v. Union Oil Co.*, 88 Cal.App.2d 78, 198 P.2d 347 (1948) (court will not enforce technical breach of lease in action for unlawful detainer).

Moreover, an overwhelming majority of courts has concluded, without reference to a specific statutory provision, that a lease may not be forfeited for a trivial or technical breach even where the parties have specifically agreed that "any breach" gives rise to the right of termination. *See* Annotation, *Commercial Leases: Application of Rule That Lease May Be Canceled Only For "Material" Breach*, 54 A.L.R.4th 595 (1987). These courts note the sophistication and complexity of most business interactions and are concerned, therefore, that the possibilities for breach of a modern commercial lease are virtually limitless. In their view, the parties to the lease did not intend that every minor or technical failure to adhere to complicated lease provisions could cause forfeiture. Accordingly, nearly all courts hold that, regardless of the language of the lease, to justify forfeiture, the breach must be "material," "serious," or "substantial."[10] Thus, well reasoned authority from other states also refutes the arguments advanced by the landlord in this case.

■ Having been squarely presented with the question for the first time, we decline to hold that any breach, no matter how trivial or insignificant, can justify a forfeiture. Nor do we believe such a rule could long survive. Trivial or not, the delay in paying the rent here was at most three days. What if the breach had been three hours instead of three days or the check had been lost in the mail and came at three minutes after midnight? The ques-

---

**10.** The following courts, in considering a variety of types of breaches, used materiality as a factor when deciding whether forfeiture was warranted. *Semidey v. Central Aguirre Co.*, 239 F. 610 (P.R.1917), *cert. denied*, 243 U.S. 652, 37 S.Ct. 479, 61 L.Ed. 947 (1917) (no forfeiture for technical breach); *Medico–Dental Bldg. Co. v. Horton & Converse*, 21 Cal.2d 411, 132 P.2d 457 (1942); *Nicoli v. Frouge Corp.*, 171 Conn. 245, 368 A.2d 74 (1976); *Sinclair Refining v. Davis*, 47 Ga.App. 601, 171 S.E. 150 (1933) (requiring breach "so substantial and fundamental as to defeat the object of the lease"); *University Club of Chicago v. Deakin*, 265 Ill. 257, 106 N.E. 790 (1914); *Bentler v. Poulson*, 258 Iowa 1008, 141 N.W.2d 551 (1966); *Kohn v. Babb*, 204 Kan. 245, 461 P.2d 775 (1969) (failure of landlord to include certain farm payments as income in accounting is not so material as to defeat the object of the parties in making the agreement); *McHugh v. Knippert*, 243 S.W.2d 654 (Ky.1951); *Lillard v. Hulbert*, 9 So.2d 852 (La.1942), *overruled on other grounds, Bodman, Murrell & Webb v. Acacia Found. of L.S.U.*, 246 So.2d 323 (La.1971); *Charles E. Burt, Inc. v. Seven Grand Corp.*, 340 Mass. 124, 163 N.E.2d 4 (1959); *Aniba v. Burleson Sanitarium*, 229 Mich. 118, 200 N.W. 984 (1924); *United Cigar Stores Co. v. Hollister*, 185 Minn. 534, 242 N.W. 3 (1932); *Intertherm, Inc. v. Structural Systems, Inc.*, 504 S.W.2d 64 (Mo.1974); *Ringwood Associates, Ltd. v. Jack's of Route 23, Inc.*, 166 N.J.Super. 36, 398 A.2d 1315 (1979); *Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979); *Joseph J. Freed & Associates, Inc. v. Cassinelli Apparel Corp.*, 23 Ohio St.3d 94, 491 N.E.2d 1109 (1986); *Barraclough v. Atlantic Refining Co.*, 230 Pa.Super. 276, 326 A.2d 477, 480 (1974) (when landlord sought forfeiture because tenant had defaulted on rental payment for two months because of clerical error fifteen years into lease agreement, court stated that "[w]hen a party has honestly and faithfully performed all material elements of its obligation under a contract, but has failed to fulfill certain technical obligations, causing no serious detriment to the injured party, it would be odious and inequitable to compel forfeiture of the entire contract); *Southern Region Indus. v. Chattanooga Warehouse*, 612 S.W.2d 162, 165–66 (Tenn.App.1981) (although tenant failed to literally comply with lease provision requiring that it give written notice of desire to renew, termination not warranted when tenant has made good faith effort to comply, has not been guilty of willful or gross negligence, and landlord has not been prejudiced); *Caranas v. Morgan Hosts–Harry Hines Blvd., Inc.*, 460 S.W.2d 225 (Tex.Civ.App.1970); *Standard Packaging Corp. v. Goodrich*, 131 Vt. 57, 300 A.2d 541 (1972); *Bolling v. King Coal Theatres, Inc.*, 185 Va. 991, 41 S.E.2d 59 (1947); *Northwestern Realty Co. v. Hardy*, 160 Wis. 324, 151 N.W. 791 (1915).

tions almost answer themselves.[11] Therefore, we now join the overwhelming majority of jurisdictions that hold the landlord's right to terminate is not unlimited. We believe a court's decision to permit termination must be tempered by notions of equity and common sense. We thus hold a forfeiture for a trivial or immaterial breach of a commercial lease should not be enforced. Accordingly, we turn to analyze whether Loehmann's breach—a three-day delay in payment—was of such dimension so as to permit forfeiture.

### D. The Standard for Evaluating the Triviality of a Breach

■ We agree with Foundation that the payment of the common area charge,[12] is a material provision of the lease. *See* Restatement (Second) of Property § 12.1; *Fifty States Management v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979) (a covenant to pay rent is an essential part of the bargain as it represents the consideration to be received for permitting the tenant to remain in possession of the property of the landlord). Nonetheless, we believe a material provision of a lease may be breached in such a trivial manner that to enforce a forfeiture would be unconscionable and inequitable. *See Smith v. Winn Dixie Stores, Inc.*, 448 So.2d 62 (Fla.App.1984); *Barraclough*, 326 A.2d at 480.

Courts often conclude a party has breached a lease provision in a material as opposed to trivial or immaterial manner based only on the specific facts at issue. They therefore do not identify a workable standard to evaluate the triviality of a breach. The Restatement (Second) of Property § 13.1 provides that if a tenant fails to perform a valid promise contained in the lease, the landlord may terminate if he "is deprived of a significant inducement to the making of the lease and the tenant does not perform his promise within a reasonable period of time after being requested to do so." We find this statement too general to be very helpful; we believe the Restatement (Second) of Contracts § 241[13] sets forth a more explicit analytical framework. It requires the factfinder to consider the following:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated [by damages] for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

**11.** One state, indeed, has held that in an action brought pursuant to a statute authorizing termination of a lease for non-payment of rent, equitable defenses would not be recognized. *See Rainey v. Quigley*, 180 Or. 554, 178 P.2d 148 (1947). The court pointed out, however, that mistake had not been alleged. *Id.* at 153. Thus, subsequent cases in Oregon have held that the statute did not bar equitable defenses of mistake, fraud, or estoppel. *See, e.g., Caine v. Powell*, 185 Or. 322, 202 P.2d 931 (1949). Furthermore, the rule does not apply in any case in which the lease contains provisions dealing with forfeiture. *See Moore v. Richfield Oil*, 233 Or. 39, 377 P.2d 32, 34 (1962). Thus, the Oregon courts have declined to adopt an absolute rule.

**12.** In addressing a tenant's obligation to make payment directly to the landlord, most courts deal with "rent" payments and not "common area charges" as such. While the lease in this case has a separate provision for common area

charges, we find it appropriate to analogize that type of payment to rental payments and accordingly refer to cases of that genre. Further, the same default provision of the Loehmann's lease applies to both cases. *See* Exhibit A, § 13.2.

**13.** The drafters of the Restatement (Second) of Property note that the law of the late twentieth century contains a still-shifting balance of property and contract concepts, with neither clearly in control. Restatement, Introduction at 4. They opine that to the extent both concepts aid in fashioning the most realistic and equitable relationships possible, it is likely that such a mixture will remain. *Id.* We thus find the rule that pertains to contracts in general regarding this issue is helpful in defining the rights of the parties in the landlord-tenant context. *See Cimina v. Bronich*, 349 Pa.Super. 399, 503 A.2d 427 (1985), *rev'd on other grounds*, 517 Pa. 378, 537 A.2d 1355 (1988) (applying similar test to determine whether lease breach was material).

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241.

We adopt these standards for determining the triviality or immateriality of a breach in the landlord-tenant context. We turn, then, to review the trial court's grant of summary judgment in Loehmann's favor. In doing so, we consider the facts in a light most favorable to Foundation. Applying the Restatement (Second) of Contracts standard to the facts of this case, did the trial court err in finding the breach to be trivial?

### E. Was the Breach Trivial in this Case?

■ The court determined that if the date of the receipt of the letter at Loehmann's store, April 13, 1987, initiated the time to pay or cure, the payment made on April 25, 1987 was two days late. Therefore, as to subsections (a) and (b) *supra,* Foundation at most would be deprived of the benefit of its bargain only in the loss of the use of the funds for two days. *See Humphrey v. Humphrey,* 254 Ala. 395, 48 So.2d 424, 427 (1950), 31 A.L.R.2d 321 (court will provide relief from forfeiture if payment is made before the landlord suffers loss or inconvenience from delinquency); *Farmer v. Pitts.* Foundation makes no claim that it was damaged by the delay in payment. Furthermore, it may be adequately compensated by a judgment of damages for any loss of interest on the funds it incurred in those two days. *See Loyalty Development Co. v. Wholesale Motors, Inc.,* 61 Haw. 483, 605 P.2d 925 (1980) (trial court did not abuse its discretion in refusing to terminate lease where tenant's breach was not due to gross negligence or to persistent and willful conduct and where landlord could be reasonably and adequately compensated for its injury and loss).

In applying subsection (c) of the Restatement standards, the factfinder should consider the extent to which the party failing to perform or to make an offer to perform will suffer forfeiture if the failure is treated as material. Restatement (Second) of Contracts § 241 comment d. In the general contract setting, a failure to perform will not be deemed material if it occurs "late, after [the breaching party's] substantial preparation or performance." *Id.* In the present case, the trial court found:

> Given the magnitude of this lease, the obvious value of the property and the lease, the approximate amount of money annually due under the lease and the history of the performance under the lease, the Court finds the breach in this case to be trivial....

Judgment, filed June 23, 1987.

The facts in the record regarding the tenant's investment (preparation), the tenant's lack of history as to previous breach during almost ten years of occupancy (performance), and the size of the breach relative to the entire amount of money annually due, support the trial judge's finding that this breach was trivial. As for subsection (d), Loehmann's has already cured its failure to perform and never indicated it was unwilling to do so.

Additionally, Loehmann's behavior comports with standards of good faith and fair dealing. The breach was not willful or persistent. *Cf. Re Ogden Howard Furniture Co.* 35 B.R. 209 (1983) (tenants' long history of deficiencies and irregular payments constituted a material breach of their covenant to pay rent); *National Shoes, Inc. v. Annex Camera & Electronics, Inc.,* 114 Misc.2d 751, 452 N.Y.S.2d 537 (1982) (rental history of chronic late payment justified termination); *Fifty States,* 389 N.E.2d at 115 ("by failing to tender payment of two monthly rental payments or even offering to cure the default, defendant tenant was in willful breach of a material term of the lease"). The fact that the breach occurred at all was arguably due to Loehmann's belief that the time for payment was initiated upon its receipt of the demand letter and statement at the Halsey Street address in New York, not the store address in Phoenix. Furthermore, the demand letter was not addressed to a particular individual, while the previous statements and correspondence were addressed

to Gaw. Lastly, the letter did not reference the previous correspondence regarding the disputed amount and in fact misstated the time period the statement covered. The fact that Loehmann's personnel engaged in responsible business practices by insuring that the payment was indeed due and the amount correct certainly does not indicate bad faith or a desire not to comply with the request for payment. The trial court's implicit finding that Loehmann's dealt in good faith and made an honest attempt to comply with the provisions of the lease is well supported in the record.

Furthermore, the record does not indicate that Loehmann's was grossly negligent. *See Rader v. Prather,* 100 Fla. 591, 130 So. 15 (1930) (in absence of gross negligence or willful and persistent violation, the court is justified in granting relief from forfeiture). It merely followed its customary business practices in forwarding the statement through its chain of command before payment was made. *See Winn Dixie Stores, Inc.,* 448 So.2d at 63 (court found "in light of the size and complexity of the corporate structure ... said breach amounts to no more than excusable neglect" and enforcing forfeiture for technical breach would be unconscionable and unreasonable).

In *Farmer v. Pitts,* the court denied forfeiture of a commercial lease even though the applicable statute permitted it. The lease stipulated that rent was due on the first day of the month. The tenant mailed the check, but because payment was three days late, the landlord notified the tenant to vacate the premises. The court's words are quite appropriate for this case:

> The ordinary principles of reason, common sense, and justice should govern in questions of this kind. The lessee, in law, had a right to assume that the Postoffice Department would do its duty and deliver the envelope containing the rent in due time, and that the lessor would, in justice, accept such rent; and if for any reason it was not received or delivered the lessee should, as a matter of ordinary fairness and justice, be advised of such fact and have a chance to remedy the same. The writer of this opinion cannot but be impressed with the idea, which seems to come from reading of the record, that it was not the rent the lessor wanted, but rather a forfeiture of the lease contract. Now, the provision of the statute regarding a forcible entry and detention, as well as the provision in the lease as to the nonpayment of the rent, is for the security of such rental to the lessor, not for the purpose of giving him an undue advantage and permitting him unjustly to obtain a forfeiture of the lease.

*Farmer v. Pitts,* 187 N.W. at 96.

In the present case, the lease did not provide a specific due date for the payment of the common area charges. Loehmann's had paid the entire annual rent and approximately fifty to seventy-five percent of the common area charge amount due and had reasonable questions about the accuracy of the final account. While Loehmann's customary practice was to pay the final common area charge in thirty days or longer, Foundation sent its demand letter—addressed to no particular individual—only sixteen days after its agent had explained the assessment and had verified that the statement was correct. Foundation did not allege that Loehmann's had been an uncooperative tenant in any other respect or that it had indicated it was not ready, able and willing to make payment. In response to a question at oral argument as to why Foundation did not simply telephone Loehmann's to inquire as to the status of the payment, Foundation responded only that it had the right to enforce the lease as written.[14]

---

14. In *Strom,* 198 P.2d 347, the court, quoting *Saxton v. Para Rubber Co.,* 166 La. 866, 118 So. 64 (1928), stated:

It is quite true that the payment of the rent in accordance with the terms of the lease is one of the essential obligations of the lessee, and the failure of the lessee to properly discharge this obligation is a legal cause for dissolving the lease. But this presupposes that ... the lessor is not endeavoring merely to entrap his lessee into a technical breach of the lease. *Strom,* 198 P.2d at 349.

Having determined that the trial court did not err in holding the breach at issue was so trivial that to enforce a forfeiture would be unjust, we must turn to Foundation's final argument: does the time of the essence clause render a trivial breach material?

## F. The Time of the Essence Clause

■ Foundation urges us to sustain the court of appeals holding that the time of the essence provision of the lease, reinstated by the demand letter, had the effect of rendering an otherwise trivial breach, by untimely performance, material. It claims the court correctly followed the rule we adopted in *Zancanaro v. Cross*, 85 Ariz. 394, 339 P.2d 746 (1959). Loehmann's argues that the importance of a time of the essence clause must be weighed against other factors and that there is no absolute rule.

In *Zancanaro* a plumbing company contracted with a builder to install plumbing fixtures in fifty homes. When the builder ceased construction after completing only twenty-five homes, the plumbing company sued to recover anticipated profits for all fifty homes. In ruling in the plumbing company's favor, we did not rely on the time of the essence provision of the contract. Rather, we found it unnecessary to do so because the builder's breach in failing to complete the homes in a reasonable time, "was a material one in and of itself." *Zancanaro*, 85 Ariz. at 399, 339 P.2d at 749. Although we stated that a time of the essence provision "operates only to give a minor breach as to timely performance the legal effect of a material breach," we neither discussed the operation of the "rule" nor applied it. *Id.* Moreover, our citation to CORBIN ON CONTRACTS § 713 leads us to believe *Zancanaro* may be construed to support Loehmann's position rather than defeat it.

Professor Corbin refutes the statement that common law judges rigidly adhered to the rule that "time is of the essence" in all contracts at common law, explaining that to determine if untimely performance is a material breach, there must be weighing "of the importance of many factors in each particular case." 3A CORBIN ON CONTRACTS § 713, at 356 (1951). *See also* Restatement (Second) of Contracts § 242 comment d ("time of the essence" clauses must be considered along with other circumstances in determining the materiality of breach). Even if the parties include a time of the essence provision, "[i]f the enforcement of such an express provision will have the effect of enforcing an excessive penalty or an unjust forfeiture, equity will prevent such enforcement." CORBIN § 715, at 360.

We believe we would be hard pressed to discover a commercial lease that did not include the condition that "time is of the essence" for payment of rent or other charges. Considering such provisions may be more appropriately included in contracts for the sale of goods where a party's performance may be conditioned on the promisor's timely performance, it is questionable whether such "stock phrases" add much to the parties' obligations in cases such as this. E.A. FARNSWORTH, CONTRACTS, § 8.18, at 618 (1982). We do not write such words out of every contract. In contracts between a vendor and purchaser, a purchaser's failure to make timely payment may be held to go to the essence and justify the seller in refusing to convey if values are rapidly fluctuating and because of the delay the purchaser would profit by the transaction. *See Findley v. Koch*, 126 Iowa 131, 101 N.W. 766 (1904) (buyer brought suit for specific performance after he delayed performance during which time land increased in value). Similarly, timely conveyance may be of the essence when a vendor is aware a buyer intends to continue a business that is already a going concern or make improvements and start a new business. *Baton Rouge Investment Co. v. Bailey*, 157 La. 838, 103 So. 184 (1925) (buyer expected to make immediate use and named a time limit); *Junius Construction Corp. v. Cohen*, 257 N.Y. 393, 178 N.E. 672 (1931) (purpose of use for a factory frustrated by delay).

If failure of payment at the exact time will not cause injury, time cannot be absolutely "of the essence," even though, tech-

nically, delay will be a breach. *See, e.g., Vermont Marble Co. v. Baltimore Contractors,* 520 F.Supp. 922, 928 (D.D.C.1981) ("the phrase 'time is of the essence' ... did not give to [subcontractor] a right to rescind on the basis of any delay, however slight and from whatever source); *Walton v. Denhart,* 226 Or. 254, 359 P.2d 890 (1961) (where new house was to be completed "on or about May 15," it was enough that contract was substantially performed by June 30, though it said "Time is of the essence of this contract."). The inquiry must always involve the facts of the individual case and the effect of the breach on the injured party. FARNSWORTH, § 8.18 at 618; Childres, *supra,* at 58; *see also Darrell J. Didericksen & Sons v. Magna Water,* 613 P.2d 1116, 1119 (Utah 1980); *Benetti v. Kishner,* 93 Nev. 1, 558 P.2d 537 (1977) (commercial tenant's failure to renew his lease in a timely fashion held not material despite "time of essence" provision).

We thus hold that a time of the essence provision is merely one factor to be considered when determining if a breach is material. The mere incantation that "time is of the essence" works no magic to transform trivial untimeliness into a material breach; rather, the same factors we delineated in determining general materiality apply to evaluating the effect of a particular "time of the essence" provision.

### CONCLUSION

A landlord's right to forfeit a leasehold is not unlimited. Neither A.R.S. § 33–361 nor any lease provision will justify the inequitable forfeiture of a leasehold for a trivial or immaterial breach. Furthermore, a time of the essence provision will not, absent other factors, automatically convert a trivial breach into a material one. Neither *DVM Co. v. Bricker* nor *Zancanaro v. Cross* requires different conclusions.

The record supports the trial judge's holding that Loehmann's breached its lease agreement with Foundation in a trivial or immaterial manner so that forfeiture was inequitable. We therefore vacate the opin-

ion of the court of appeals and affirm the trial court's judgment in Loehmann's favor.

GORDON, C.J., CAMERON and MOELLER, JJ., and LIVERMORE, Judge, Court of Appeals, concur.

CORCORAN, J., recused himself and did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, JOSEPH M. LIVERMORE, Judge, Court of Appeals, Division Two, was designated to sit in his stead.