NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

CITY OF TEMPE, *Defendant/Appellee*.

*v.*

LEJAS CORPORATION, *Defendant/Appellant*.

No. 1 CA-CV 23-0542

FILED 08-27-2024

Appeal from the Superior Court in Maricopa County
Nos.  CV2020-003865
CV2020-006152
(Consolidated)
The Honorable Dewain D. Fox, Judge

**AFFIRMED IN PART; VACATED AND REMANDED IN PART**

COUNSEL

May, Potenza, Baran & Gillespie, P.C., Phoenix
By Justin R. DePaul, Jesse R. Callahan, Andrew S. Lishko
*Counsel for Defendant/Appellant*

City Attorney, City of Tempe, Tempe
By Sonia M. Blain, Sarah R. Anchors, Matthew J. Mansfield
*Counsel for Defendant/Appellee*

---

## MEMORANDUM DECISION

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Kent E. Cattani and Judge Paul J. McMurdie joined.

---

**C A M P B E L L**, Judge:

¶1 This appeal arises from general contractor Lejas Corporation's installation of a storm drain as part of a City of Tempe project. After the City discovered the issue, the parties engaged in cooperative discussions about possible cures for months. The City then terminated the contract and refused to pay any portion of Lejas's final payment application for the retention amount and work performed to specifications.

¶2 This action followed.[1] The superior court entered summary judgment for the City on Lejas's claims for breach of contract, violation of the governing prompt pay statute, breach of contract on a curative contract, and declaratory relief. The court also entered summary judgment for the City on its counterclaim for breach of contract. We affirm the judgment only insofar as it pertains to Lejas's claim that the City breached a contract for curative work because no evidence showed that such a contract was formed. We otherwise vacate and remand, holding that material factual disputes preclude summary judgment.

## BACKGROUND

¶3 In September 2018, the City hired Lejas as the general contractor for the construction of pickleball courts. The parties' contract (the Contract) specified the following: Lejas was to perform all work on the project in accordance with defined specifications and was to install all material "in a good and workmanlike and substantial manner and to the satisfaction of the City or its properly authorized agents and strictly pursuant to and in conformity with the Contract." Under Section 6.4.2 of the Contract, Lejas would be "deemed in default" if it "fail[ed] to adequately perform the services set forth in the plans and specifications of

---

[1] Subcontractor Hurricane Fence Company and surety Philadelphia Indemnity Insurance Company were also parties to the action, but they are not part of this appeal.

and fail[ed] to cure such non-performance within ten (10) days after written notice from City." In the event of a default, the City could terminate the contract and hire a different contractor.

¶4    Lejas was to submit payment requests on a standard form and the City would make payments in accordance with the prompt pay statute for public construction projects, A.R.S. § 34-221. "[F]inal payment" was contingent on Lejas "turn[ing] over the entire work in full accordance with these specifications." Before making the final payment, the City would complete a "final inspection" to determine if the work was "completed in accordance with the Contract," and, through the record engineer or architect, would certify all record drawings were complete. Completion was defined as "full completion of all construction associated with the Contract," including a close-out package containing, among other things, the certified record plans. The Contract specified, "Contractor is responsible for complying with the specifications and is hereby forewarned that final approval of any work will not be given until the entire project is completed and accepted by City."

¶5    Lejas began work on the project and received multiple progress payments, with the City withholding retention of five to ten percent from each payment. The City then discovered that Lejas, acting on a subcontractor's advice, had installed a storm drain approximately 2.5 inches below the design specifications.

¶6    The parties began talking about how to resolve the deviation. In late March 2019, the City's outside design firm proposed grading and a pipe extension to address the "incorrectly constructed pipe elevation." Lejas objected to the allegation that the work was "incorrectly constructed" but stated that the subcontractor wanted to resolve the dispute by simply raising the pipe to the design elevation—even though the subcontractor believed this would be insufficient to properly evacuate stormwater. The City responded that it believed a correction to the design elevation, plus a pipe extension, was the best solution. The parties continued to discuss elevation concerns and possible solutions.

¶7    In May, the City opened the pickleball courts to the public with the storm drain issue still unresolved. On June 13, Lejas submitted a payment application (Pay Application 6), which was labeled "FINAL," seeking $52,226.35. Most of that sum represented the retention amounts held on the previous progress payments, but $13,253 was for new work, specifically installing a windscreen.

¶8            On June 21, Lejas provided a proposal for correcting the storm drain elevation issue. The City responded that the price was too high given that "we are paying [Lejas] to fix [its] mistake." Lejas explained that its subcontractor insisted on a premium for a quick turnaround.

¶9            On July 1, the City told Lejas it could not process Pay Application 6 without the close-out package. In response, Lejas submitted as-built drawings noting "Additional Drainage Solutions Forthcoming."

¶10            On July 15, the City issued a "Non-Conformance Report" for the storm drain, directing Lejas to "correct to design elevation or contact [the City] with alternatives." The parties then met and discussed a potential alternative. Lejas indicated that it would provide a proposal for the alternative but never did so.

¶11            On October 9, the City issued a default notice giving Lejas until October 18 to provide "an agreeable proposal to correct its non-conforming work." The City also provided an estimate from a different contractor to correct the storm drain for $27,086.97 and indicated it would withhold that amount from the retention balance to pay that cost if necessary. The letter also stated that "Lejas has had ample time to present the City with a proposal to correct its non-conforming work and has failed to do so," but the City was nonetheless giving Lejas "this final opportunity to submit a proposal to correct." The City warned that it would move forward with the other contractor's estimate if Lejas did not provide "a written proposal" by the deadline, noting that "Lejas failed to cure its non-performance within the ten-day period prescribed by section 6.4.2 of the Contract[, t]he Contract does not require that the City give Lejas any further opportunity to cure the non-conforming work beyond that ten-day period, and therefore the City reserves the right to reject any proposal submitted by Lejas[] and move forward with its alternative estimate."

¶12            Lejas responded in writing on October 10 with "the two options for grading the area around the storm drain." The City replied that it was "not necessarily opposed to [those] workaround solutions, and [was] certainly willing to work with [Lejas] on them," but would need additional details as well as a drainage plan by a licensed engineer given that the workaround would "change the design" and not "bring[] the work back into conformance with the original design specifications." Lejas responded that it believed its proposal was the best solution for a problem for which the City, the City's design firm, Lejas, and Lejas's subcontractor all bore some responsibility. The City wrote back that it "agree[d] with the concept

[of the workaround] but would like to meet in the field with [Lejas] and contractor to see exactly what the limits of construction will be."

¶13      Lejas then provided a written proposal. The City responded that Lejas should add riprap removal to the proposal and delete overhead and profit. The City directed Lejas to provide a revised proposal "so that we can set up a new contract for this work," and indicated that it "would like to receive the revised proposal by the end of [the] day tomorrow." Lejas promptly responded that removing the riprap would risk damaging the water line and that, in its view, the overhead and profit were fair. The City replied on October 30 that it "need[ed] to insist" on the riprap removal despite the risk (which it acknowledged), and that overhead and profit were "not negotiable and the City will not pay for it." The City concluded, "If you [would] like us to proceed please revise your proposal or we will proceed with the other option. If you need to discuss this further, please call me [the construction manager]." On November 8, Lejas's representative sent a text message to the project manager asking, "Can I call you." The project manager did not respond.

¶14      On November 12, Lejas unilaterally had its subcontractor begin grading at the site. Lejas's representative explained that at this point, he "was so tired of this BS with the City going around and around and being held hostage for a project that was completed." During the grading, the subcontractor ruptured an irrigation line, which caused a flood and halted the work.

¶15      On November 14, the City sent Lejas a letter terminating the Contract under Section 6.4. The City barred Lejas from the project site and stated it would be hiring different contractors to bring the project back to the design specifications and repair the damage from the grading work. The City stated that it would be "withholding Lejas's full remaining retention balance of $36,455.26" to pay for the corrective and repair work.

¶16      The City never corrected the storm drain to the design specifications. Nor did it implement a workaround. The only action the City took was to place safety fencing around the graded area. The City never paid Lejas *any* portion of Pay Application 6, asserting that it never came due because Lejas's work was never completed. In a deposition, however, the City construction manager testified that the City "would definitely" have paid the windscreen portion of Pay Application 6 had it been applied for separately from the retention—it was just that "we don't break pay requests . . . by ourselves."

**¶17** Lejas sued the City, and the City asserted counterclaims. As relevant here, Lejas asserted claims for breach of contract and violation of the applicable prompt pay statute, A.R.S. § 34-221, based on the City's refusal to pay for Pay Application 6 and the November grading work. Lejas also sought declaratory relief. For its part, the City asserted, as relevant here, a counterclaim for breach of contract based on Lejas's failure to follow the project specifications and complete its work.

**¶18** The City moved for summary judgment on the claims and counterclaim described above, and so did Lejas. The superior court entered summary judgment for the City on the claims and counterclaims. The City thereafter released its right to establish damages, stating that the cost to show the damages would exceed their measure. The superior court awarded the City about $47,200 in attorneys' fees under A.R.S. § 12-341.01, and about $3,200 as sanctions under Arizona Rule of Civil Procedure 68.

**¶19** The superior court entered a final judgment and denied Lejas's motion for post-judgment relief. Lejas timely appealed.

## DISCUSSION

**¶20** Lejas argues that the superior court erred by entering summary judgment for the City.[2] Summary judgment is appropriate where "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). We review a grant of summary judgment de novo, viewing the evidence and reasonable inferences in favor of the non-moving party. *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12 (2003). We review the interpretation of contracts and statutes de novo. *Am. Power Prods., Inc. v. CSK Auto, Inc.*, 242 Ariz. 364, 367, ¶ 12 (2017).

### I. Summary Judgment on Lejas's Breach of Contract and Prompt Pay Claims

**¶21** We first address whether the superior court properly entered summary judgment for the City on Lejas's claims for breach of contract and violation of the prompt pay statute.

---

[2] Lejas does not meaningfully reprise its arguments that it was entitled to judgment as a matter of law.

A.    **Breach of Contract for Failure to Pay for November Grading**

¶22    Lejas asserts that summary judgment was improper on the claim that the City committed breach of contract by failing to pay for the November grading work. The superior court correctly found that Lejas did not address this claim in its response to the City's summary judgment motion. Nor did Lejas address this claim in its summary judgment motion. But moreover, an enforceable contract requires objective evidence of mutual assent. *Hill-Shafer P'ship v. Chilson Fam. Tr.*, 165 Ariz. 469, 473–74 (1990). Here, no evidence showed that the parties ever reached an agreement for a curative plan—to the contrary, the City's last missive indicated that it required a revised proposal and contemplated further discussion. Accordingly, the court properly entered summary judgment for the City on Lejas's claim of breach of contract related to the November grading work.

B.    **Breach of Contract and Violation of A.R.S. § 34-221 for Failure to Pay for Pay Application 6**

¶23    Lejas next argues that summary judgment was improper on Lejas's claim that the City breached the Contract and violated the prompt pay statute by failing to pay for Pay Application 6. Lejas's right to payment was governed by A.R.S. § 34-221, and nothing in the Contract could materially alter the statute. *See* A.R.S. § 34-221(D).

¶24    The statute provides that a contractor may apply for progress payments and that such an application "shall be deemed approved and certified for payment seven days after the date of submission unless before that time the owner or owner's agent prepares and issues a specific written finding setting forth those items in detail in the estimate of the work that are not approved for payment under the contract." A.R.S. § 34-221(C)(2). If the owner timely issues a written disapproval, it may withhold sums "sufficient to pay the expenses the owner reasonably expects to incur in correcting the deficiency set forth in the written finding." *Id.* Otherwise, the owner must pay the approved amount—less a retention percentage—within 14 days. A.R.S. § 34-221(C)(2), (3), (5). The retention amount, which ensures proper performance from start to finish, automatically comes due after the project is completed. A.R.S. § 34-221(C)(2), (5). The owner must pay the retention "within sixty days after completion or filing notice of completion of the contract," with retention "longer than sixty days after final completion and acceptance requir[ing] a specific written finding by the purchasing agency of the reasons justifying the delay in payment," and any withholding limited to "the expenses the purchasing agency reasonably

7

expects to incur in order to pay or discharge the expenses determined by the purchasing agency in the finding justifying the retention of monies." A.R.S. § 34-221(C)(5). All improperly delayed payments accrue interest. A.R.S. § 34-221(J).

¶25 Here, in Pay Application 6, Lejas requested not only the retention amount but also payment for installing a windscreen—work that the City admitted it would have paid for if presented in a separate application. The superior court, however, treated the application solely as a request for the retention and concluded that it never came due because the project was never completed. This was error. Nothing in the statute specifies how a pay application must be characterized if it requests payment for the retention (an item for which no application is even required) and payment for other work performed. *See* A.R.S. § 32-221. And to the extent the Contract purported to make any "final" application subject to the retention-payment portion of the statute, this was ineffective as a matter of law. *See* A.R.S. § 34-221(D).

¶26 There was, at the least, a genuine dispute of material fact regarding the nature of Pay Application 6. Because it contained a demand for both new work and the retention amount, there is a factual dispute about whether the City complied with the prompt pay provisions of A.R.S. § 32-221. We therefore vacate the entry of summary judgment on Lejas's breach of contract and prompt pay claims arising from the City's failure to pay any portion of Pay Application 6.

## II.  Summary Judgment on the City's Breach of Contract Counterclaim

¶27 We next address Lejas's argument that the superior court improperly entered summary judgment for the City on its counterclaim for breach of contract.

¶28 Where a contract states that a particular condition's occurrence or non-occurrence shall constitute a material breach of the agreement, we must give that language effect—even if the condition might not be material under common-law principles. *Mining Inv. Grp., LLC v. Roberts*, 217 Ariz. 635, 639, ¶¶ 14–17 (App. 2008); *see, e.g.*, 5 Philip L. Bruner & Patrick J. O'Connor Jr., *Bruner & O'Connor on Construction Law* § 18:12, at n. 14 (2023) ("Under the principle of 'freedom of contract,' parties may agree that performance will be judged under a standard of 'strict' or 'full' performance. Otherwise substantial performance is the standard required by common law. . . . Where parties expressly agree to perform work to the 'highest generally accepted level of care and skill' or to perform 'in strict

accordance with the owner's plans and specifications,' contractors may be held to a stricter level of performance than mere substantial performance.") (citations omitted).

¶29        We agree with the City that the Contract (the enforceability of which Lejas never challenged) defined conduct that could constitute a material breach.[3] Under the terms of the Contract, Lejas was responsible for strictly complying with the design specifications, and Section 6.4 spelled out that a deviation from the specifications would constitute a default—i.e., a material breach—if not cured within ten days of the City's written notice. It is undisputed that Lejas did not strictly comply by installing the storm drain a few inches lower than the design specifications. Nevertheless, under the terms of the Contract, the deviation would constitute a material breach only if Lejas failed to cure it within ten days' written notice. And there is a genuine dispute of material fact regarding this second element.

¶30        When the City discovered the deviation, it began talking to Lejas about either correcting the work to the specifications or implementing a workaround. When Lejas first provided a written proposal, the City advocated for a lower price but made no demands for performance. The City then issued a Non-Conformance Report that invited Lejas to propose alternatives. The parties then discussed a potential workaround.

¶31        As noted above, months passed before the City, for the first time, demanded that Lejas provide an acceptable proposal within ten days. When Lejas provided two workaround solutions the next day, the City did not reject the proposal but rather stated that it was "willing to work with" Lejas, "agree[d] with the concept," and wanted to keep talking. Lejas thereafter provided a written proposal. The City objected to some aspects of the proposal and demanded that Lejas make revisions so the parties could "set up a new contract for this work." The City indicated that it "would like to receive" the revised proposal by the next day but did not specify a deadline. When Lejas refused to make the revisions, the City warned that it would "proceed with the other option"—i.e., hiring another contractor to correct the work to the specifications. But the City again specified no deadline and affirmatively invited Lejas to call the construction manager for further discussion. When Lejas asked the project manager for

---

[3]        Lejas's representative acknowledged the same in deposition, testifying that the City had the right to demand compliance with the design plan even if the plan was flawed.

a telephone conversation about a week later, the project manager never responded.

¶32  Based on these facts, it is debatable whether Lejas failed to cure the deviation on proper notice. Though the City repeatedly informed Lejas that it needed to cure, it anticipated paying Lejas to do so—an act not contemplated under the original contract and at odds with the idea that Lejas was responsible for curing any defect. Moreover, after each notice, the City responded amenably to Lejas's ideas and continued to engage in cooperative discussions designed to reach a mutual agreement. Even when the City issued a "final warning" that it would "proceed with the other option"—i.e., a default—the City invited Lejas to call for further discussion about resolving the outstanding construction issue.

¶33  On this record, there is a genuine dispute of material fact regarding whether Lejas committed a material breach under the terms of the Contract. Further, even if the Contract's definition of material breach is set aside, it is, at the least, debatable whether the elevation of the storm drain constituted a material breach—particularly given that the City was able to open the project to the public and never took any curative action after terminating the Contract with Lejas (which also casts doubt on the question of the fact of damages). *See Found. Dev. Corp. v. Loehmann's, Inc.*, 163 Ariz. 438, 446–47 (1990) (describing common-law factors for determining materiality of breach, including the extent to which the injured party is deprived of its reasonably expected benefit). We vacate the entry of summary judgment for the City on its breach of contract counterclaim.

### III. Summary Judgment on Lejas's Declaratory Relief Claim

¶34  Lejas further argues that the superior court improperly entered summary judgment for the City on Lejas's declaratory relief claim. Lejas sought declarations that Pay Application 6 was approved as a matter of law, that Lejas had substantially completed its work and was not in default under the Contract, and that Lejas was not responsible for any costs associated with a defective design. Because we hold that the trier of fact must determine the nature of Pay Application 6 and whether Lejas materially breached the Contract, we conclude that summary judgment on the related declaratory relief claim was improper. We vacate the entry of summary judgment for the City on that claim.

### IV. Attorneys' Fees and Sanctions

¶35  We finally address the attorneys' fees and sanctions awarded to the City. The court awarded fees under A.R.S. § 12-341.01 and sanctions

under Rule 68 based on its determination that the City prevailed on summary judgment. *See* A.R.S. § 12-341.01(A) (providing for attorney's fees for "successful party" in contested action arising from contract); Ariz. R. Civ. P. 68(g) (providing for sanctions where party rejects offer of judgment "but does not obtain a more favorable judgment"). Because we hold that the entry of summary judgment was largely improper, we vacate the fee and sanction awards.

## CONCLUSION

**¶36** We affirm the entry of summary judgment for the City on Lejas's claim that the City breached a contract for curative work. We vacate the entry of summary judgment for the City on Lejas's claims that the City breached the Contract and violated A.R.S. § 34-211 by failing to pay for Pay Application 6, and we vacate the entry of summary judgment for the City on Lejas's related declaratory relief claim. We vacate the awards of attorneys' fees and sanctions as well. We remand the case to the superior court for further proceedings consistent with this decision.

**¶37** We deny the parties' competing requests for attorneys' fees on appeal under A.R.S. § 12-341.01. Lejas may recover its costs on appeal upon compliance with ARCAP 21. *See* A.R.S. § 12-341 (providing that successful party shall recover costs); *Montano v. Luff*, 250 Ariz. 401, 407, ¶ 18 (App. 2020) (holding that substantially prevailing party is eligible for costs).



AMY M. WOOD • Clerk of the Court
FILED:   AGFV